# Supreme Court of Texas

No. 22-0256

Alfred Dewayne Brown,

*Appellant,*

v.

City of Houston, Texas; Harris County, Texas; Breck McDaniel;
Ted C. Bloyd; D.L. Robertson,

*Appellees*

On Certified Question from the
United States Court of Appeals for the Fifth Circuit

**Argued September 22, 2022**

JUSTICE YOUNG delivered the opinion of the Court.

Many years ago, the People of Texas voted to change our Constitution to allow the State to compensate individuals who had been wrongfully imprisoned. Our legislature then enacted and has repeatedly amended a statute to implement this policy. That statute—now called the Tim Cole Act to memorialize a man who was posthumously exonerated—provides an administrative process through which claimants may receive compensation, so as long as they agree "not [to] bring any

1

action involving the same subject matter . . . against any governmental unit or an employee of any governmental unit." Tex. Civ. Prac. & Rem. Code § 103.153(b). The scope of this statutory settlement of claims is what we must address in this case.

The claimant here, Alfred Dewayne Brown, filed suit in federal court against various state governmental entities and employees for his alleged wrongful imprisonment. While that suit was pending, Brown received Tim Cole Act compensation through the state administrative process. In a certified question, the United States Court of Appeals for the Fifth Circuit asks us to determine whether, under §103.153(b), Brown's receipt of that compensation bars him from maintaining his federal lawsuit.[1] Based on the text, structure, and history of the Tim Cole Act, along with our prior decisions interpreting it, we must hold that a claimant may not maintain such a suit once he has received Tim Cole Act compensation, and therefore answer the Fifth Circuit's certified question *yes*.

## I

Alfred Dewayne Brown was charged with the capital murder of a Houston police officer. Brown asserted his innocence. He could not have been guilty, he said, because he was at his then-girlfriend's home, from which he had made phone calls at the time in question. Brown was nevertheless convicted and sentenced to death. He was imprisoned for about twelve years, most of them on death row.

---

[1] Unless otherwise noted, all statutory references are to the Texas Civil Practice and Remedies Code.

Brown never abandoned his claim of innocence. In 2015, he secured his release through a post-conviction habeas petition, alleging that the prosecutor had failed to disclose exculpatory evidence. The Texas Court of Criminal Appeals vacated his conviction and the State declined to retry him, instead moving to dismiss his charges based on a lack of evidence. The district court granted the motion and Brown became a free man.

Following his release, Brown sought compensation for the time he spent imprisoned. He first applied to the Comptroller for compensation under the Tim Cole Act. The Comptroller, however, denied his petition, finding that Brown did not qualify under the statute because his habeas relief was not based on a finding of actual innocence. Brown sought to cure the defect, but the Comptroller reaffirmed his decision.

With this avenue for relief apparently closed, Brown decided to sue. He filed claims in federal court under 42 U.S.C. § 1983, alleging that the City of Houston, Harris County, and various city law-enforcement officials had violated his constitutional rights. According to Brown's brief before this Court, his discovery in that suit allowed him to uncover an old email from the prosecutor of his capital-murder case. The email revealed that the prosecutor had known that evidence supported Brown's alibi all along, Brown says, thus repudiating the prosecutor's prior denials. Despite being told about the importance of the evidence, however, the prosecutor had failed to disclose it.

In light of Brown's discovery, the Harris County District Attorney's Office appointed a special prosecutor to conduct an independent

investigation into Brown's criminal case.[2]  Almost a year later, the special prosecutor released a 179-page report, concluding that Brown could not have been present at the crime scene and that no reasonable juror could find Brown guilty of the murder.  In short, the special prosecutor found Brown actually innocent.

Based on the results of the independent investigation, the Harris County District Attorney's Office filed an amended motion to dismiss Brown's criminal charges.  The motion recited the special prosecutor's findings that no evidence substantiated the charges and that Brown was innocent.  The district court granted the amended motion, withdrew its previous dismissal order, and dismissed Brown's charges on the newly stated grounds.

With a judicial declaration of innocence finally in hand, Brown again applied to the Comptroller for compensation under the Tim Cole Act.  The Comptroller denied this petition, too.  Brown technically met all the statutory conditions for entitlement to compensation, but the Comptroller concluded that the district court had lacked jurisdiction to issue the dismissal order based on Brown's innocence.  As before, Brown attempted to cure his application, but to no avail.

Brown therefore invoked this Court's original and exclusive mandamus jurisdiction to challenge the Comptroller's decision.  Brown argued that the Comptroller had no authority to go beyond the verified

---

[2] Harris County suggests that this discovery did not precipitate the investigation.  The County does not, however, offer an alternative reason as to why the investigation began.  Whatever the motivation, the general timeline is undisputed and, regardless, nothing in our decision turns on why the County undertook the investigation.

4

documents submitted in support of the claim for compensation. We agreed. In *In re Brown*, we held that the Comptroller's ministerial duty did not include reviewing a district court's determination of jurisdiction. 614 S.W.3d 712, 723 (Tex. 2020). We accordingly directed the Comptroller to withdraw his denial of Brown's application and to compensate Brown for the time he spent wrongfully imprisoned. *Id.* at 724. The Comptroller complied. Brown has received—and continues to receive—compensation under the Tim Cole Act.

Meanwhile, while we considered and ultimately granted Brown's mandamus petition, Brown continued litigating his federal claims.[3] After he eventually received compensation from the State, however, the defendants argued that Brown could no longer litigate his federal case. In their motion for summary judgment, the defendants argued that Brown's receipt of that compensation foreclosed his suit. They invoked § 103.153(b), which states that if someone "receives [Tim Cole Act] compensation," that person "may not bring any action involving the same subject matter" against parties like the defendants here. The district court agreed with the defendants and granted their motion. 538 F. Supp. 3d 725 (S.D. Tex. 2021).

On appeal, the parties disputed whether § 103.153(b) had any effect on Brown's lawsuit after he received compensation from the State. Emphasizing the statute's use of the word "bring," Brown argued that there was no statutory bar. The lawsuit has already been *brought*, he

---

[3] Brown's lawsuit was stayed pending the investigation by the Harris County District Attorney's Office. The stay was lifted after the Comptroller denied Brown's second application.

argued, so under its plain text, § 103.153(b) does not limit his ability to continue litigating his claims. The defendants, on the other hand, argued that Brown's interpretation of § 103.153(b) was too narrow. According to them, the word "bring" does not mean merely "file" or "initiate." Instead, they argued, *maintaining* a suit—and pursuing it at each level of the judiciary until final judgment—is bound up in "bring[ing]" an action.

The Fifth Circuit identified this issue as an important one on which our precedent does not directly speak. It therefore certified to us the following question:

> Does Section 103.153(b) of the Tim Cole Act bar maintenance of a lawsuit involving the same subject matter against any governmental units or employees that was filed before the claimant received compensation under that statute?

We accepted the certified question and now answer it *yes*.

## II

As with every question of statutory construction, our duty is to accurately articulate the meaning of the enacted text—here, of the Tim Cole Act. When the text unambiguously answers a question, our inquiry ends. Our precedents assist in this inquiry. Our decisions are not themselves the statutes that they interpret, but they can provide authoritative and binding constructions of those statutes. If the plain text or a precedent of this Court could readily resolve the dispute between the parties, the Fifth Circuit would not have certified this question. We therefore begin with an overview of the text and the guidance that our precedents provide, then proceed to examine the larger statutory context.

6

## A

We agree with the Fifth Circuit that the statutory text, standing alone, cannot resolve this case. In full, § 103.153(b) provides:

> A person who receives compensation under this chapter may not bring any action involving the same subject matter, including an action involving the person's arrest, conviction, or length of confinement, against any governmental unit or an employee of any governmental unit.

The operative word is "bring." In a vacuum, "bring" certainly could mean "initiate." But the Fifth Circuit itself has rejected the notion that, regardless of context, a suit "brought before" a state court means that it was merely "initiated" in one. *Dynamic CRM Recruiting Sols., L.L.C. v. UMA Educ., Inc.*, 31 F.4th 914, 919–20 (5th Cir. 2022). In at least some legal contexts—including the forum-selection clause at issue in that case—"brought" means "to cause a civil action to exist under the jurisdiction of." *Id.* at 920. The existence of the action requires continuity, not merely initiation. The sense in which "bring" is used in a legal text, in other words, requires at least some further analysis, unless our Tim Cole Act cases already compel a given result.

## B

We also agree with the Fifth Circuit that our Tim Cole Act decisions do not fully resolve this case. But they come close. The first decision that informs our understanding of the text is *State v. Oakley*, 227 S.W.3d 58 (Tex. 2007). We held there that a wrongfully imprisoned man's settlement with *the City of Austin* did not bar his subsequent Chapter 103 suit (back when Chapter 103 allowed such suits) against *the State*. "By limiting [§ 103.153(b)] to a person who 'receives' compensation

7

from the State," we said, "the Legislature barred other suits only by those who have Chapter 103 funds in hand." *Id.* at 63. "[T]he statute," we later noted, "grants immunity to local government entities once the State has paid a Chapter 103 claim." *Id.*

Unlike the plaintiff in *Oakley*, Brown has a pending suit *and* "Chapter 103 funds in hand." *Id.* If our observations in *Oakley* applied here, therefore, Brown has triggered § 103.153(b)'s litigation bar. Put differently, § 103.153(b) applies "*once* the State has paid a Chapter 103 claim." *Id.* (emphasis added). Brown, for his part, emphasizes the "explicit sequence" that *Oakley* had in mind. *Id.* But that sequence does not help him—first comes State payment, then comes the litigation bar. Brown has received the former, so the government defendants he has sued would have an affirmative defense under the latter.

*Oakley* nonetheless cannot end our inquiry because it did not address a fact pattern like Brown's or construe the word "bring." But *Oakley* is not our only relevant precedent. In Brown's own first case in this Court, we again suggested the view of Chapter 103's litigation bar that the defendants press and that the district court adopted. When we granted Brown's petition and required the Comptroller to award him compensation, we recited the fact that the "Tim Cole Act's administrative process for settling wrongful-imprisonment claims reflects a balancing of policy choices." *In re Brown*, 614 S.W.3d at 723. In a footnote, we added this observation about § 103.153(b)'s scope:

> The administrative remedy under the Tim Cole Act works to the exclusion of *any other action* "involving the same subject matter, including an action involving the person's arrest, conviction, or length of confinement," and in doing so, the Legislature has spared governmental units, governmental

8

employees, and the wrongfully imprisoned the uncertainty and expense of litigation.

*Id.* at 723 n.60 (emphasis added) (quoting § 103.153). The defendants believe that this statement resolves the case; Brown counters that it was essentially a loose paraphrase of the statute and that the actual text, rather than dicta summarizing it, must control in the event of a discrepancy.

We again agree with Brown that his prior case does not resolve his present one. And unlike in *Oakley*, § 103.153(b)'s scope was not specifically before us in Brown's mandamus action. Our observation quoted above accurately reflected the *general* policy decision the legislature had made, but we had no occasion to zero in on—much less make a holding about—the word "bring."

Brown's argument thus remains open despite *Oakley* and *In re Brown*. But his argument confronts a formidable barrier because both cases forecast a commonsense reading of the statute that could be undermined only if a careful analysis of the text and history reveals something significant that our cases have not yet considered. We therefore proceed to examine the statutory text in its full context.

### III

In legal texts, particularly those of complexity, "meanings cannot be determined in isolation but must be drawn from the context in which they are used." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011). "Context," after all, "is a primary determinant of meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). Among the core contextual considerations that generate reliable constructions are the surrounding

provisions of a disputed text and how that text arises within the statute's larger historical sweep.[4]  We address each in turn.

## A

We begin with the immediate context of the word "bring" as used in § 103.153(b).  Two contextual indicia shed light on § 103.153(b)'s scope: that subsection's title and its surrounding text.

Start with the title: "Employees Not Liable After Payment of Compensation."  The title suggests that "after" the State has paid a claimant, government employees are no longer "liable."  That understanding runs counter to Brown's interpretation, which would allow government employees to remain liable even after payment.  We readily agree, of course, that the title of a statutory provision cannot override the plain meaning of the underlying text.  But a title can at least "inform the inquiry into the Legislature's intent," *TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 75 (Tex. 2016), and by providing further confirmation of our cases' reading, it has done so here.

The second contextual guidepost lies in the surrounding text of § 103.153(b) itself.  While Brown reasonably focuses on the word "bring," the same subsection also says "any action."  It provides that "[a] person who receives compensation under this chapter may not bring any action involving the same subject matter[.]"  § 103.153(b).  By conditioning receipt of funds on promising not to "bring *any* action," and not simply a

---

[4] *See, e.g.*, Scalia & Garner, *supra*, at 33 ("[C]ontext embraces not just textual purpose but also (1) a word's historical associations acquired from recurrent patterns of past usage, and (2) a word's immediate syntactic setting—that is, the words that surround it in a specific utterance.").

10

subsequent action under the Tim Cole Act (which, as described below, was a *prior* avenue for relief that has since been closed), the legislature requires us to conceptualize § 103.153(b)'s bar more broadly than Brown's narrow reading would allow. The statute, in other words, suggests an intent to make the State's payment of compensation the final word, foreclosing further proceedings in any forum regarding a claimant's allegation that his imprisonment had been wrongful.

Even these considerations, however, are not dispositive. It is at least theoretically possible that "bring" *still* could provide a mechanism for recovery *after* State payment, contrary to § 103.153's title and our statement in *Oakley*. Brown's argument turns on the idea that "bring" overcomes the statute's context and the intimations of our precedent, under which the sequence of filing suit before receiving State compensation appears to be determinative. Thus, the statute's larger history and broader context remain important.

**B**

As an initial matter, Brown dismisses the statute's history as irrelevant "legislative history." The argument implicates a fundamental distinction. *Legislative* history is generally useless to courts—indeed, it can be worse than useless because it is manipulable and relies on what *never* was the law. *See, e.g.*, *In re Facebook, Inc.*, 625 S.W.3d 80, 88 n.4 (Tex. 2021). By contrast, "quite separate from legislative history is *statutory* history—the statutes repealed or amended by the statute under consideration," which "form part of the context of the statute" that *is* the law. Scalia & Garner, *supra*, at 256. Statutory history is therefore probative and sometimes indispensable in statutory interpretation. As

11

then-Justice Willett put it the year before Scalia and Garner wrote: "[N]obody should quarrel with examining how an enacted statute changes over time. . . . [T]his is the history of the legislation, not legislative history." *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 445 n.31 (Tex. 2011) (Willett, J., concurring). Statutory history concerns *how the law changed*, which can help clarify *what the law means*. Statutory history does not concern collateral or speculative questions such as the policy goals that motivated individual legislators, the reasons that a given version of a legislative proposal was not adopted, or the like.

In this case, two aspects of statutory history inform our analysis: (1) the words that the legislature has used in adopting and amending this statute, which help us understand what "bring" means; and (2) the larger structure of how the statute operates to provide compensation to those who warrant it, which helps us understand when the legislature intended to foreclose (or allow) litigation as such a mechanism.

**1**

The Tim Cole Act is part of our statutory law because, as is generally true in Anglo-American jurisprudence, Texas common law historically afforded no remedy to those who were wrongfully imprisoned. Indeed, the modern prison system *and* the tort law that might have provided relief are both comparatively recent products of the mid-to-late nineteenth century. *See* Lawrence M. Friedman, *A History of American Law* 278–87 (4th ed. 2019). The State of Texas itself "came late to the penitentiary system" in 1848, *see id.* at 282, having declared its independence just twelve years earlier. Given these relative novelties, it is perhaps unsurprising that "[t]he common law provided no recourse

12

for the innocent." *In re Smith*, 333 S.W.3d 582, 585 (Tex. 2011).

Positive law to fill the lacuna eventually came—and the history of how it came is relevant to understanding the words that govern this area of law today. Over a century after Texas authorized state penitentiaries, *see* Act of Mar. 13, 1848, 2d R.S., ch. 80, 1848 Tex. Gen. Laws 79, 79–84 ("An Act to establish a State Penitentiary"), the People decided that those who had been wrongfully imprisoned should not bear the loss of such misfortune alone. That sovereign policy decision manifested itself in a constitutional amendment approved in November 1956, which authorizes the legislature to "grant aid and compensation to any person" fined or imprisoned "for an offense for which he or she is not guilty, under such regulations and limitations as the Legislature may deem expedient." Tex. Const. art. III, § 51-c. The amendment was a cautious, aspirational step. It did not directly promise anything to anyone, for by its terms the amendment was not self-executing. *See, e.g.*, *State v. Clements*, 319 S.W.2d 450, 453 (Tex. Civ. App.—Texarkana 1958, writ ref'd). It simply authorized legislation for its stated purpose.

The legislature took up the invitation about a decade later when it passed "[a]n Act concerning the payment of aid and compensation to persons who have paid fines or served sentences for crimes of which they are not guilty." Act of May 28, 1965, 59th Leg., R.S., ch. 507, 1965 Tex. Gen. Laws 1022, 1022–24. Like the law today, the original 1965 version prescribed specific circumstances under which a claimant was eligible for compensation. In that version, for example, someone who both was "not guilty of the crime" and had "received a full pardon" from the governor would qualify. *See id.* § 2. Unlike the law today, however, the

13

original version lacked any administrative process through which claimants could seek compensation.  Only one option existed: to "bring suit against the State of Texas," and claimants had to do so "either in the county of [their] residence at the time such suit is commenced or in a court of competent jurisdiction for Travis County."  *Id.* § 3.

In the following decades, the law underwent several revisions, one of which was its recodification as Chapter 103, where (subject to later amendments) it stands today.  *See* Act of June 15, 1985, 69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws 3307.  Like its 1965 predecessor and unlike the current version, the 1985 legislation provided that the only way in which claimants could seek compensation was "to bring a suit against the state."  *Id.* (formerly Tex. Civ. Prac. & Rem. Code § 103.002(a)).

Notably, the 1985 version also employed related words: "bring," "initiated," "brought," and "commenced."  Section 103.002 of the 1985 legislation, for example, used those words in three different provisions, proceeding in seriatim-like form:

> (a) A person may *bring* a suit against the state under this chapter, and the state's immunity from the suit is waived.

> (b) The suit must be *initiated* by a verified petition alleging that the petitioner is entitled to compensation.

> (c) The suit shall be *brought* in a court of competent jurisdiction either in the county of his residence at the time the suit is *commenced* or in Travis County.

*Id.* (formerly Tex. Civ. Prac. & Rem. Code § 103.002(a)–(c) (emphasis added)).

This series of seemingly similar verbs provided the first textual indication that, at least in this context, words like "bring" or "brought" were not simply interchangeable with others like "initiate" or

"commence." It is commonplace for us to presume that the legislature intended different meanings by using different words. *E.g.*, *DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex. 1995) (describing this presumption as a "familiar canon of construction"). Like nearly every canon of construction, that presumption is rebuttable by context, but we *start* with the principle that different words convey at least some distinction in meaning.

As applied here, the use of "bring" or "brought" readily lends itself to a temporal connotation—that the legislature was speaking to a suit's duration, not merely to its filing (or its "initiation" or "commencement," two words that largely *do* overlap, as far as we can see). "Initiation" and "commencement" literally focus on a *single* moment in time; they are limited to a starting point. It mattered where the petitioner resided at the moment he filed suit, and to get the ball rolling, the petitioner had to file a verified petition at that time. But just as one can "bring" something throughout an entire journey, not just at its start, the statute's use of "bring" and "brought" was more naturally connected to the ongoing role of the court than "initiate" or "commence" could be. "Bring," in other words, is less tethered to the historic fact of something having begun at a single point in time. Indeed, *bringing* a case "in a court of competent jurisdiction," as subsection (c) puts it, implies a continuing status—a court that *stops* having jurisdiction could not proceed any further. Trial courts, after all, lose jurisdiction after someone "brings" an appeal, as Brown did in this litigation.

This construction finds support in both dictionaries and case law. Webster's, for example, uses synonyms such as "conveying, leading, or

15

carrying" in its definition of "bring." Webster's New International Dictionary 337 (2d ed. 1934). A litigant could thus very well *bring* suit in the sense that he both filed it and is continuing to carry it through until its end, including by bringing the case to an appellate court.

The Fifth Circuit itself has construed "bring" that way in analogous contexts. In *Dynamic CRM*, that court held that when a forum-selection clause required a suit to be "brought before" a particular state court, merely "initiating" the litigation there was not enough. 31 F.4th at 919–20. Instead, the Fifth Circuit approvingly quoted the district court's understanding of "brought before": "to cause a civil action to exist under the jurisdiction thereof." *Id.* at 920 (internal quotations omitted). Thus, a case could not just be filed in state court—it had to *stay there*. True, the litigation was "brought before" the state court in the single-point-in-time sense. But the clause was not concerned with that detail; it was directing the proper forum for the litigation as a whole. Thus, removal from state court to federal court would mean that the case was no longer "brought before" the state court, as the clause required. *Id.*

We see no reason why that analysis of ordinary language in a contractual forum-selection clause would not equally apply to the same terms when similarly used in a statute. Indeed, in *Serna v. Law Office of Joseph Onwuteaka, P.C.*, the Fifth Circuit construed a federal statute and observed (again, contrary to Brown's view) that "the phrase 'bring such action' does not have a plain meaning synonymous with filing a pleading." 732 F.3d 440, 443 (5th Cir. 2013). Nor is the Fifth Circuit alone. *See, e.g.*, *Bowles v. Am. Stores, Inc.*, 139 F.2d 377, 378 (D.C. Cir.

16

1943) (holding that "bring an action" meant not only to "commence a suit" but also to "prosecute the suit to judgment").

We again emphasize, however, that we do not hold that "bring" is capable of only one construction, even in statutes involving the litigation process. As a counterexample to *Dynamic CRM*, *Serna*, and *Bowles*, Brown cites a case from the Third Court of Appeals, *Walters v. Livingston*, 514 S.W.3d 763 (Tex. App.—Austin 2016, no pet.). The court in *Walters* construed the phrase "bring an action" to mean what Brown submits here: "the initiation of suit." *Id.* at 768. *Walters* is not a precedent of this Court and we express no opinion about its accuracy. Even so, that case illustrates only that context is paramount in statutory interpretation. The statute at issue—the Texas Religious Freedom Restoration Act— focuses on a deliberate and detailed scheme of specific times at which parties must give notice of and cure alleged statutory violations. "Bring," when placed in that strict limitations-like context, focuses primarily on whether a given requirement had occurred by a given point in time. In that sense, "bring" plays a more rigid or limited function than it does in cases like *Dynamic CRM* or this one. Indeed, as we discuss next, the history and context of the Tim Cole Act demonstrate the legislature's intent to move pending litigation toward the administrative process by *eliminating* the litigation pathway altogether—not to fixate on whether litigation had begun at Time A rather than Time B.

**2**

In 2001, the legislature amended Chapter 103 again to provide, for the first time, *two* vehicles through which claimants could seek compensation: by suit (the original means) or by an administrative

17

application to the Comptroller (the new means). *See* Act of June 15, 2001, 77th Leg., R.S., ch. 1488, 2001 Tex. Gen. Laws 5280. In doing so, the legislature gave claimants a choice. They could either (1) file suit or (2) follow the administrative process. But not both. *Id.* (formerly Tex. Civ. Prac. & Rem. Code § 103.002 ("A person entitled to compensation under Section 103.001 may proceed [by filing an administrative application] under Subchapter B or by filing suit under Subchapter C, but a person may not seek compensation under both Subchapters B and C.")).

Also significantly, the 2001 amendments specifically contemplated situations in which claimants, like Brown, had already filed suit:

> A person who has not received compensation under Chapter 103, Civil Practice and Remedies Code, as it existed before the effective date of this Act, *including a person who has brought a suit under that chapter but whose suit has not been settled or finally adjudicated*, may . . . file an application for compensation . . . .

*Id.* § 3(a) (emphasis added). Thus, together with the provision detailing the choice of how to resolve the claim, this provision ensured that those who had already filed suit could not simply pursue *both* avenues.

The last relevant statutory change came about in 2009, when the legislature renamed Chapter 103 after Tim Cole, an innocent man who died in prison. *See* Act of May 27, 2009, 81st Leg., R.S., ch. 180, 2009 Tex. Gen. Laws 523. The Tim Cole Act left certain provisions in place (such as § 103.153(b), the disputed provision here), and eliminated others (like claimants' option to sue the State). *See id.* Thus, since 2009, the sole vehicle through which claimants may seek compensation is an administrative application to the Comptroller. *See* § 103.051. As far as the legislature is concerned, Tim Cole Act compensation cannot be

18

achieved by litigation *at all*. The existence of other potential claims—like suits in federal court—are addressed by § 103.153(b)'s broad reach, which bars the successful claimant from also being a plaintiff who "bring[s] *any* action involving the same subject matter" as the wrongful imprisonment that led to Tim Cole Act compensation. (Emphasis added.)

Of course, when the legislature eliminated the lawsuit option in 2009, it also removed the guidance regarding pending suits against the State. The removal of that guidance, however, does not suggest that the legislature intended, *sub silentio*, to provide claimants two available remedies (a 180-degree turn from its previously expressed intention) by the sheer coincidence of when a lawsuit happened to be filed. Quite the opposite. Wholly eliminating the lawsuit option suggests instead that the legislature intended to narrow the remedies available to applicants, funneling claims exclusively through the administrative process.

Brown responds by hypothesizing that the legislature could have rationally thought that discovery would assist in proving innocence, as it did in his case. The access to that federal-court discovery may have been beneficial or even indispensable to his ultimate receipt of Tim Cole Act compensation. But it does not follow that this fortuitous consequence justifies, much less requires, reading the statute to preserve a post-compensation claim. Indeed, Brown would have filed suit *regardless* of what the statute said on this point, precisely because he had been unable to obtain relief in the state system. Whatever role discovery played in this case, we cannot reverse-engineer a theory to generate a result that is otherwise at odds with the statute's text, structure, and history. It is open for the legislature to expand Tim Cole Act access as broadly as it

wishes. But until it does so, we cannot conclude that the legislature envisions any place for lawsuits in its statutory-compensation scheme.

\* \* \*

Although this review of the history may seem arcane, it provides at least two relevant points. First, when we interpret § 103.153(b), "bring" does not necessarily mean "initiate." The legislature used those words (in addition to "brought" and "commence") in different contexts—even within the same subsection—indicating the *likely* presence of distinctions in meaning. Second, changes to Chapter 103 since 2001 reveal that the legislature has understood the two viable routes to compensation—either a lawsuit or administrative application—as mutually exclusive. Claimants could opt for one or the other, but not both. That was true even for those who had already filed suit. Then the legislature foreclosed the litigation option altogether, despite retaining § 103.153(b)'s expansive restriction that conditions the payment of compensation on abjuring *any other* litigation involving the same subject matter.

**IV**

The foregoing textual and contextual analysis, we think, is sufficient to decide this case. But even if any doubt remained, we would still read "bring" in a way that preserves immunity. In the Tim Cole Act, the legislature has exercised its constitutional authority to allow the Comptroller to pay compensation despite sovereign immunity and to allow this Court to compel the Comptroller to do so if the law and the record so require. *In re Brown* reflects the consequences of this legislative decision. But that choice came with the caveat in § 103.153(b), and we cannot read that subsection outside its immunity-waiving context. The

20

caveat is part of and inseparable from the waiver of immunity. Especially in light of the statute's context and history, we cannot conclude that § 103.153(b) authorizes the maintenance of a suit like Brown's absent a textual mandate compelling that result.

Accordingly, despite our respect for Brown's arguments, we have found no basis to disturb the reading of § 103.153(b) that *Oakley* and *In re Brown* forecast. To the contrary, our analysis has bolstered that reading. Brown's acceptance of Tim Cole Act compensation means that he has agreed not to "bring" a lawsuit in any forum against governmental entities or employees that involves the same subject matter as his Tim Cole Act claim. "Bringing" an action in this context entails maintaining it.[5] We therefore answer the Fifth Circuit's certified question *yes*.

_____
Evan A. Young
Justice

**OPINION DELIVERED:** February 3, 2023

---

[5] We recognize that Brown has also argued to the federal courts that, whether or not Texas law forbids him from maintaining a lawsuit after receiving Tim Cole Act compensation, *federal* law authorizes his lawsuit to proceed. The Fifth Circuit did not ask us to opine on this question and we express no opinion about it.